# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**OLD REPUBLIC INSURANCE COMPANY,
and RYDER TRUCK RENTAL INC.,**

         Plaintiffs,

     **-vs-**                      **Case No.  14-C-165**

**LIBERTY MUTUAL FIRE
INSURANCE COMPANY,**

         Defendant.

---

# DECISION AND ORDER

---

This insurance coverage and liability dispute arises out of a chain-reaction highway accident involving three semi-trucks.  The action is before the Court on cross-motions for summary judgment filed by Plaintiffs Old Republic Insurance Company ("Old Republic") and Ryder Truck Rental Inc. ("Ryder") and Defendant Liberty Mutual Fire Insurance Company ("Liberty").  (ECF Nos. 23, 50.)

Subject matter jurisdiction is afforded under 28 U.S.C. § 1332 because the parties are citizens of different states[1] and the amount in controversy exceeds $75,000, exclusive of interest and costs. Venue is

---

[1] Old Republic is a Pennsylvania corporation with its principal place of business in Greensburg, Pennsylvania; Ryder is a Florida corporation with its principal place of business in Miami, Florida; Liberty is a Massachusetts corporation with its principal place of business in Boston, Massachusetts.  (ECF No. 37 ¶¶ 2-4; No. 38 ¶¶ 2-4.)

appropriate in this District.

## Standard for Summary Judgment

Summary judgment is appropriate if the record evidence reveals no genuinely disputed material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party. *Rosario v. Brawn,* 670 F.3d 816, 820 (7th Cir. 2012). When confronted by cross-motions for summary judgment, "inferences are drawn in favor of the party against whom the motion under consideration was made." *McKinney v. Cadleway Props., Inc.,* 548 F.3d 496, 500 (7th Cir. 2008).

## Relevant Facts[2]

In August 2008, a multiple semi-truck chain reaction accident occurred on Interstate 80/94 near Gary, Indiana when Mark Harmon ("Harmon") drove his tractor and semi-trailer into a semi-truck driven by Ross Johnson ("Johnson"), which, in turn, came into contact with a semi-truck driven by Elias Martinez ("Martinez"). Harmon was employed by Expedited Freight Systems, Inc. ("Expedited"), a Wisconsin-based company, and was driving a tractor Expedited leased from Ryder; attached

---

[2] The relevant facts are based on the parties' proposed findings of fact and additional proposed findings. Citations to quoted materials are provided.

was a semi–trailer Expedited leased from another company.

Expedited leased the tractor from Ryder under a Truck Lease and Service Agreement (the "lease"), which stated:

> 9A. **Liability Insurance**. The party designated on Schedule A (the "Insuring Party") agrees to furnish and maintain, at its sole cost, a policy of automobile liability insurance with limits specified on each Schedule A for death, bodily injury and property damage, covering both you and Ryder as insureds for the ownership, maintenance, use, and operation of each Vehicle ("Liability Insurance"). If you are the Insuring Party, the terms of the policy and the insurer must be acceptable to Ryder. *The Liability Insurance must provide that its coverage is primary and not additional or excess coverage over insurance otherwise available to either party, and must include any and all statutory requirements of insurance imposed upon you and/or Ryder*. The Insuring Party agrees to designate the other party as an additional insured on the Liability Insurance and to provide the other party with insurance certificates evidencing the required coverage.

(Emphasis added.) (ECF No. 37-2, p. 3.)

Schedule A to the lease identified Ryder as the party responsible for liability insurance:

> 14. <u>Party Responsible for Liability Insurance</u>: Ryder. Combined Single Limits $1,000,000 per occurrence. Customer Deductible: $1,000 per occurrence. You agree that Ryder shall have the sole right to conduct accident investigations and administer claims handling and settlements and you shall adhere to and accept Ryder's conclusions and decisions.

(*Id*. at 7.)

Under the Old Republic policy, the tractor was a "covered auto."

- 3 -

The policy had a liability limit of $1 million. Ryder, Expedited, and Harmon were "insureds" under the policy for the claims asserted in the underlying lawsuits. As of the date of the accident, Expedited was the named insured under a Liberty policy, and the leased semi-trailer was a "covered auto." The policy had a liability limit of $1 million. As part of its required reporting to the federal regulatory authority, Expedited listed Liberty as its primary liability insurance carrier from February 26, 2004, through February 26, 2010.

The Liberty policy required those seeking coverage to "immediately" provide notice of lawsuits filed against an insured:

**2. Duties In The Event Of Accident, Claim, Suit Or Loss**

*We have no duty to provide coverage under this policy unless there has been full compliance with the following duties:*

\* \* \*

b. Additionally, you and any other involved "insured" must:

(1) Assume no obligation, make no payments or incur no expenses without our consent, except at the "insured's" own cost.

(2) *Immediately send us copies of any request, demand, order, notice, summons or legal paper received concerning the claim or "suit."*

(Emphasis added.) (ECF No. 53-1, pp. 94-95.)

Expedited employee Dan Kepple ("Kepple") provided Liberty with its

- 4 -

first notice of the accident on August 14, the date it occurred. He contacted Liberty, and its records indicate "Tractor is covered under a Ryder policy and is not covered under Liberty." (ECF No. 26-2, pp. 78-79.) Shortly after the accident, Liberty requested a copy of the lease between Ryder and Expedited to confirm that Ryder, not Liberty, provided liability coverage for the accident.

As of August 14, Liberty was aware that Expedited, its insured, "expected" a claim to be filed against it as a result of the accident. Liberty initiated an investigation of the accident, requesting photos of the vehicles' damage, a property damage appraisal for the insured semi-truck, and medical records. Liberty's claims diary for August 14 and 26, 2008, lists entries for "Ross Johnson—Liability-Bodily Injury." (ECF No. 56-1, pp. 6, 9.)

On August 15, Liberty noted that it had contacted Expedited to get the trailer information, and that Liberty was "[u]nable to create new collision claim with the trailer without the information. [Kepple] believes the tractor is covered under a Ryder policy and not Liberty. Will mature tractor collision claim in case of coverage."[3] (ECF No. 26-2, p. 77.)

---

[3] Liberty asserts that the two comments from Expedited relate only to collision coverage not liability coverage.

Liberty's claims diary from September 15, contains the following entry:

> Author          LIZA GAUTREAU
>
> Topic           Coverage
>
> Related To      Entire event
>
> Subject         Lease Agreement . . . .
>
> Sep 15, 2008 09:17 A.M.
>
> Lease Agreement- VIN # 1 FUJA6CK17LY50139 Date of Delivery- 11/02/2006 Party Responsible for Liability Insurance: Ryder. Combined Single Limits $1,000,000 per occurrence. Customer Deductible: $1,000 per occurrence. You agree that Ryder shall have the sole right to conduct accident investigations and administer claims handling and settlements and you shall adhere to and accept Ryder's conclusions and decisions.

(ECF No. 56-1, p. 4.)   On September 15, Liberty determined "Per the investigation Ryder is responsible for Liability Insurance and it is appropriate to close out this claim and document for 'records purposes only.'"  (ECF No. 26-2, p. 73.)

**Martinez and Johnson Lawsuits**

On August 3, 2010, Martinez sued Harmon and Ryder in Illinois state court.  On August 10, 2010, Johnson sued Harmon and Expedited in Indiana state court.    Ultimately, the cases were removed and/or transferred to federal court in the Northern District of Indiana

- 6 -

Liberty was not contacted or otherwise informed of the Johnson and Martinez lawsuits when they were filed. Liberty's first notice of the Martinez lawsuit was received on April 4, 2012. Liberty "cannot identify the exact date" it received its first notice that Johnson had filed suit for his injuries. (ECF No. 26-1, p. 4.)

Old Republic acknowledged that its insurance policy provided "primary" liability insurance coverage to the named defendants in the Martinez and Johnson lawsuits, and it defended the named defendants in those suits. Old Republic retained Attorney Thomas S. Ehrhardt ("Ehrhardt") to defend both lawsuits. Liberty has made no payment towards defense costs in either lawsuit.

The Johnson lawsuit remained pending for over a year, proceeding through discovery and to a September 2011 mediation, with Attorney Larry Britton ("Britton") representing Ryder. Later in September, the case settled for a payment from Ryder/Old Republic of $290,000 for Johnson's bodily injury claims. That payment reduced the limits available for the Martinez lawsuit. At the time of the Johnson settlement, defense counsel's file contained photographs showing significant head and face lacerations to Johnson and evidence of the following: permanent nerve and muscle damage to Johnson's left cheek; past and future lost wages/income in a

- 7 -

minimum amount of $55,516.19; past medical bills in a minimum amount of $39,281.89; viable claims for significant future loss of income/earning capacity damages; viable claims for exacerbation of a pre-existing lower back condition (20% impairment rating by the Veteran's Administration); and viable claims for post-accident psychological trauma, including a fear of driving, and resultant lost income. Based on Ehrhardt and Britton's education, insurance and personal injury defense experience (20 years each), and the evidence obtained during the investigation and defense of the Johnson lawsuit, both attorneys are of the opinion that the Johnson bodily injury settlement of $290,000 was an outstanding result.

About the time of the Johnson settlement, Ryder/Old Republic also paid $81,792.26 to settle property damage claims asserted by the owners/insurers of the two other semi-trucks damaged in the accident. The Johnson settlement and property damage payments reduced Ryder's remaining policy limits to $628,207.74.

Liberty had no notice of the Johnson action and no opportunity to participate in its defense or settlement.[4] Liberty has not paid any amount towards the settlement of the Johnson lawsuit.

---

[4] There is a genuine dispute of material fact regarding whether Liberty had "no notice" of the property damage claims. (*See* ECF No. 66, p. 6.)

- 8 -

Before the Martinez lawsuit was filed, Ehrhardt provided an "initial evaluation and pre-suit analysis" to Ryder, estimating the settlement value of Martinez's claim at between $250,000 and $350,000. After the Martinez lawsuit was filed, Ehrhardt's updated evaluation of the potential verdict and settlement value was between $325,000 and $450,000.

During the first year after filing, the Martinez action proceeded through a scheduling conference, amended pleadings, discovery and numerous discovery disputes and motions to compel, and a stipulation conceding liability. In August 2011, Martinez filed a motion to expedite trial date. After a telephone conference with the court, a settlement conference was scheduled for February 2, 2012, and trial was set to begin on March 5, 2012. By the end of 2011, Martinez had undergone medical procedures related to his knee.[5]

Approximately two months before trial, Ryder filed a motion to continue the settlement conference and trial dates. (ECF No. 53-4, pp. 119-23.) In that motion, Ryder stated that it "continued to receive" medical records from Martinez related to his care; in addition it had learned that Martinez was "a candidate for some form of surgical intervention about his

---

[5] The parties disagree whether Martinez had "significant" treatment of his neck or cervical spine region by the end of 2001. (*See id.* at p. 7.)

cervical spine." (*Id.* at 119-20.) Ryder requested that the court vacate the upcoming settlement conference and trial dates.

Martinez filed a motion for extension of time to complete discovery, arguing that he should be given additional time to undergo more surgeries and obtain expert testimony. At the time the motions were filed, the case had been pending for 16 months. Old Republic agreed to Martinez's motion to strike the trial and extend scheduling dates because Martinez was still treating at the time, and he was seeking additional time to finish treating. Counsel was confident that in any event Martinez's motion to adjourn the trial and extend the scheduling deadlines would have been granted. At a January 12, 2012, status conference the court granted the motions and vacated the settlement conference and trial dates.

The Ryder employee primarily responsible for handling lawsuits arising out of the accident, including the Johnson and Martinez lawsuits, was Patricia McDermott ("McDermott"). Her first notice of the Liberty policy was in February 2012. She immediately asked Expedited to put Liberty on notice of the claim/suit.

On April 4, 2012, Ed Duffy ("Duffy"), an Expedited employee, called Liberty and informed it about the Martinez lawsuit, saying, "there is a lawsuit on this claim" but it was "[b]eing defended by another insurance

- 10 -

company." (ECF No. 56-1, pp. 3-4.)  Duffy "wanted to know if there was any additional coverage." (*Id.*)

> The next day, Liberty contacted Duffy who indicated:

> Ryder has been defending a lawsuit since it was initiated one of their attorneys have [sic] contacted them looking for additional policies - they have in house counsel of their own and Ryder defending them . . . asked why Ryder has a million in coverage. . . he said he will send over copies of our policies . . . to pltf counsel and just wanted us to know. . . he will have his attys contact us if there is any exposure to this policy.

(*Id.* at 1.)

On August 31, Matthew Rodliff ("Rodliff"), a Liberty supervisor, assigned the matter to claims handler Michael Greeley ("Greeley").  The claim note reads, in part, "Mike, assigning this to you for handling. Appears that Ryder is seeking coverage in some form on our policy (concurrent, excess?)" (ECF No. 26-2, pp. 68-69.)  Rodliff communicated to Greeley that Ryder was seeking coverage from Liberty including possibly "concurrent coverage."  (ECF No. 67-1, p. 30.)  Greeley believed that the Liberty policy was excess for both Johnson's and Martinez's claims.

In a letter dated August 13, Martinez's counsel demanded $3.5 million to settle his claim.  (ECF No. 53-4, pp. 68-69.)  As part of his review, Greeley contacted McDermott on September 6 and informed her that he was looking into the claim to determine whether Liberty's policy

was "applicable to this loss." He asked McDermott to provide any information she could. (ECF No. 55-1, p. 15.)

About September 7, Liberty was aware that Ryder/Old Republic had paid over $75,000 to settle the property damage claims arising out of the accident and $290,000 to settle Johnson's bodily injury claims. Beginning September 7, Liberty requested and periodically received information from defense counsel retained by Ryder/Old Republic and their claims adjusters regarding the facts, status, and evaluations of the Martinez lawsuit. However, there were times Liberty did not receive responses and had to renew its requests for information. On September 7, Greeley wrote to McDermott and requested copies of the relevant reports, documents and pleadings, along with a copy of Ryder's entire claims file. Greeley also requested information on upcoming dates, scheduling orders and trial dates. McDermott did not forward any of the requested information to Greeley but passed his request on to Ehrhardt.

As a result of her discussions with Greeley, on September 21 McDermott acknowledged to her supervisor that it appeared Expedited "will have excess coverage through Liberty." (ECF No. 53-4, pp. 111-12.) A settlement conference in the Martinez lawsuit was scheduled for December 4, 2012.

- 12 -

McDermott also informed Greeley that due to the payment of property damage claims and the Johnson settlement, there was only $628,000 remaining on Ryder's limits for the Martinez lawsuit. McDermott stated that she had very little information about the potential value of the Martinez lawsuit and was waiting for additional documents, and that Old Republic questioned the relationship of the accident to the injuries Martinez was claiming as well as Martinez's current state of disability and inability to return to work.

About September 11, Liberty informed Expedited that it was "looking into this matter and after our review, we would let [it] know what coverage was available." (ECF No. 26-2, p. 65.)

On September 24, Ryder/Old Republic told Liberty that the Old Republic policy offered primary insurance coverage for the lawsuits and that they had paid $81,792.26 in property damage claims and $290,000 to settle the Johnson lawsuit. About the same time Ryder/Old Republic also told Liberty that Old Republic's policy offered primary coverage for the insured's lawsuits and that it "believe[d] Liberty's policy [was] excess." (*Id*. at 58.)

In a September 24 telephone conference, Ehrhardt indicated that he did not believe Martinez was credible about the scope of his injuries during

- 13 -

his deposition, and there was surveillance of Martinez showing that he was able to move without limitation and did not appear injured.

On about October 11, Liberty's coverage review concluded that its policy provided "excess" insurance coverage (*id.* at 57), and it evaluated the value of the Martinez case at over $900,000. As part of his review of the file, Greeley reviewed the lease agreement and noted that pursuant to the language of the lease Ryder was responsible for liability insurance, had a $1 million coverage limit, and the "lease is silent regarding other insurance or excess insurance." (ECF No. 55-1, p.16.) The record cited by Liberty also establishes that the liability coverage was "under investigation," that the coverage had been sent to the home office for analysis,[6] that the driver was an employee of Expedited, that liability was 100% adverse, and that the driver was cited for following too closely for conditions and also may have dozed off just before the accident. (*Id.*)

After performing a coverage analysis, Greeley concluded that Liberty's liability coverage policy was "above" the Ryder/Old Republic coverage. Greeley testified that Liberty had concluded, sometime before

---

[6] There is a factual dispute between the parties as to whether Liberty requested coverage analysis from its home office on about September 5, 2012. (ECF No. 59, p. 6.)

September 6, that its coverage was "excess" to Old Republic/Ryder's.

In a November 5 status report, Ehrhardt provided two settlement scenarios: The first estimate was that the settlement value would be between $100,000 and $130,000; the second estimate was that the settlement value would be between $160,000 and $185,000. On November 7, Ehrhardt indicated that he agreed with an estimation by Britton that the Martinez lawsuit had a value between $200,000 and $250,000, but acknowledged the possibility that a jury could award damages in excess of $1.5 million if it believed Martinez's neck and back surgeries were related to the accident. (ECF No. 53-4, p. 101.) Ehrhardt also concluded, "we have good arguments from our experts that the back/neck surgery is not related." (*Id.*)

Greeley gave his contact information to Ehrhardt in case Ehrhardt wanted to contact him during the December 4, 2012, settlement conference, or in the event that a settlement over Ryder's limits was considered. In preparation for the settlement conference, McDermott noted that Expedited's excess carrier was on notice and would be available by telephone standby. At the settlement conference, Ryder offered $80,000 to settle the case in response to Martinez's unyielding demand for $3.5 million. The $80,000 offer was made at the suggestion of the federal

- 15 -

magistrate mediating the case, who recommended against increasing the offer. Because of Martinez's refusal to "come down" from $3.5 million, offering anything more would have meant that Ryder/Old Republic were bidding against themselves which was discouraged by defense counsel.

About January 16, 2013, Liberty, by means of Greeley, sent a "hammer letter" to Ryder/Old Republic stating that the value of the Martinez case could exceed the remaining limits of both liability policies and instructing Ryder/Old Republic to settle within its remaining limits. Greeley described the valuation of the Martinez case above the remaining limits as a "realistic" assessment. (ECF No. 67-1, p. 20.)

On March 12, Greeley inquired again about the "current plan" to resolve the case, and again demanded that Ryder settle the case within its remaining policy limits. (ECF No. 54-1, pp. 28-29; No. 53-4, p. 90.)

On June 13, 2013, Greeley sent an email asking, "Anything new in this case? Has a private mediation been scheduled? Have you engaged in any additional negotiations or made any new offers?" (ECF No. 53-4, p. 125.)

Subsequently, trial in the Martinez action was set for January 13, 2014, and mediation was scheduled for November 19, 2013.

On October 29, 2013, Greeley sent an email to McDermott giving her

- 16 -

his contact information and indicating he would be available for the mediation via telephone. Greeley also sent a letter to McDermott in which he summarized their previous conversations, stating:

> You previously confirmed that your coverage is primary for Mr. Martinez's injury claim and your policy has $628,204.74 in remaining available coverage for this claim. As you know, the plaintiff alleges serious injuries requiring multiple surgeries and an alleged inability to return to his job. Despite the defense arguments, there is a risk that this case could result in a verdict in excess of your coverage limits.
>
> It is my understanding that you have not increased your current settlement offer of $80,000 since the December 2012 Mediation. As we have advised, it is our position that keeping your settlement offer at $80,000 is not reasonable based on the alleged damages and your counsel's evaluation that the case value could exceed your coverage limits
>
> . . . .
>
> We also remind you of your fiduciary duty to Liberty Mutual as the excess carrier. Liberty expects you to make every effort to resolve this case within your available policy limits and that you negotiate in good faith. If you miss an opportunity to settle within the available coverage limits, Liberty will pursue all legal means to hold you fully responsible for any excess judgement.

(ECF No. 53-4, pp. 109-10.)

McDermott did not respond to Greeley's letter and did not dispute at that time that Liberty Mutual provided excess coverage for the accident above Ryder's primary coverage.

On November 11, 2013, Greeley and Britton had a telephone call

- 17 -

regarding the upcoming mediation, which was followed by a letter from Britton on the same date. Britton informed Greeley that Ryder had authorized him to offer the remaining limits of Ryder's primary coverage and that he would keep Greeley apprised throughout the mediation. He stated that he assumed Martinez's demands would be in excess of the remaining $628,207.74, and that Greeley was welcome to attend the mediation. (*Id*. at 117.)

On November 15, 2013, Britton emailed McDermott and Ken Meier, McDermott's supervisor on the file, stating:

> I do want to take a look at the Liberty policy today to see if we have any argument thaton [sic] them being required to pay a pro rata share of defense costs. If I can make that argument it will give me some leverage to get more money from [Greeley].

(*Id*. at 106.)

Later the same day, Britton emailed a letter to Greeley that for the first time stated Ryder/Old Republic's position that Liberty's policy provided "primary" insurance for the Martinez action, and that "Liberty Mutual owe[d] a pro rata share for any amounts paid to settle this claim, as well as a pro rata share of any and all costs and fees paid to defend this matter to date." (ECF No. 57-1, p. 57.) On November 18, Greeley noted that he had received a letter from Ryder's coverage counsel (Britton)

- 18 -

stating that it believed Liberty was "co-primary" for coverage and that Liberty owed a pro-rate share of any settlement as well as any defense costs to date. (ECF No. 26-2, p. 37.)

After receiving Britton's letter, Greeley contacted counsel for Expedited, who confirmed that it was his understanding Ryder was providing primary coverage and Liberty was excess. Greeley sent an email to Britton responding,

> It is not in good faith for Ryder to change their position on coverage essentially one day before the mediation. For the past five years, Ryder has maintained the position that Ryder's policy is primary for coverage. Ryder has communicated this position to Expedited Freight and to Liberty Mutual. Ryder chose, hired, and paid for the defense attorney handling the case, and never told Liberty Mutual about this incident or lawsuit until 2012.

> I direct your attention to the lease agreement, DRAFTED BY RYDER, which clearly states that Ryder's $1,000,000 Liability Coverage "is primary and not additional or excess coverage over insurance otherwise available to either party." Liberty's policy provides coverage on a primary basis for "leased autos" only when required by the lease agreement (not the case in Ryder's lease).

> Regardless of our policy provisions, we believe Ryder's lease agreement clearly provides for full defense and indemnity from Ryder's policy and maintaining your current position is grounds for a bad faith lawsuit.

> It is prejudicial to Liberty Mutual's and our policyholder's rights for you to now try to change your coverage position after handling it for 5 years. Liberty Mutual has never been consulted in the defense of this lawsuit. Ryder did not even

- 19 -

put Liberty on notice until 2012, when it advised that our policy may be exposed on an excess basis.

It is clear from plaintiff counsel's 2012 letter, that Ryder had never attempted to settle this claim and had never made a settlement offer. The first (and only) offer from Ryder appears to have been made a[t] the first mediation in December 2012. At that mediation, Ryder's sole offer was $80,000. This is clearly not a reasonable attempt to try to settle this matter and not a reasonable effort to try to protect the insured from a potential verdict that could exceed the available insurance coverage.

Liberty expects that Ryder will negotiate in good faith to try to resolve this case at tomorrow's mediation and that Ryder stands ready to tender their entire policy limit if necessary. If Ryder continues to place its interests ahead of the interests of Mr. Harmon and Expedited Freight; Liberty Mutual will, on their behalf, institute a bad faith action against Ryder seeking any and all available remedies and damages.

(ECF No. 53-4, p. 130.)

On November 19, 2013, the day of the mediation in the Martinez action, Britton and Greeley reached an agreement whereby Ryder would attempt to reach a settlement at the mediation and pay up to their remaining available limits, and Liberty would contribute if settlement required amounts in excess of Ryder's remaining limits. The parties agreed that each insurer would reserve all their rights on the coverage issue. As of November 19, Martinez's demand was $2.2 million, still in excess of the Ryder/Old Republic and Liberty policy limits. The lawsuit did not settle at that mediation, but the parties continued to engage in

- 20 -

settlement efforts. As of November 22, Liberty assessed the value of the Martinez case as at least $970,000.

By a December 9 agreement, Old Republic/Ryder and Liberty each reserved their rights to pursue coverage/declaratory judgment actions against the other for defense costs and coverage/indemnity amounts paid on behalf of the mutual insureds, without any waiver of those rights by paying towards settlement(s). Old Republic/Ryder demanded 50% of the defense and settlement costs from Liberty. Liberty rejected that demand.

Over the course of the next two weeks, while Greeley was attempting to settle the Martinez action, Britton sent multiple letters to Greeley reiterating his theory that Liberty had co-primary coverage for both the Johnson and Martinez actions and owed 50% of all defense and settlement costs in both matters. During the settlement negotiations, counsel for Martinez indicated that he believed the defendants were not negotiating in good faith and threatened to pursue a claim for bad faith.

Had Liberty been afforded the opportunity, it would have proactively handled the defense of the matter, contacting Martinez's counsel early in the case and making multiple attempts to settle the case along the way. However, at no time prior to the final mediation had Martinez made a settlement demand less than $2.2 million, an amount in

- 21 -

excess of both the Old Republic and Liberty policy coverages.

The Martinez lawsuit settled in December 2013 for a payment of $1,050,000. The final settlement was negotiated by Liberty/Greeley, not Ryder/Old Republic. Ryder/Old Republic paid $628,207.74, the funds remaining under its policy limit, to settle the bodily injury claims asserted in the Martinez lawsuit. Liberty paid $421,792.26 in partial settlement of the Martinez lawsuit.[7]

Liberty's claims file diary indicates that the Martinez settlement of $1,050,000 was a "good result." At the time of the Martinez settlement, defense counsel's file contained evidence of the following: viable claims for knee surgeries and back surgeries related to the accident (by his treating physicians); defense medical testimony indicating Martinez's knee treatments were related to the accident; claimed medical and indemnity (worker's compensation) benefits of $277,380.29; viable claims for past wage loss/lost earning capacity in the amount of $192,000; viable claims for

---

[7] There is a genuine dispute of material fact regarding whether Old Republic paid $242,907.78 in attorneys' fees and expenses to defend Ryder, Expedited and Harmon in the Martinez and Johnson lawsuits. (ECF No. 59, ¶ 41.) Liberty contends that the documents cited in the proposed finding, exhibit C (ECF No. 26-3), do not establish that the costs identified were for defense of the claims asserted in those lawsuits. The supporting declaration states, "[e]xhibit 'C' is a true and correct copy of the 'payment history' for the accident in issue, kept by Ryder (as claims administer for Old Republic Insurance Co.), in the ordinary course of business, reflecting all payments made (defense costs and coverage/indemnity payments) arising out of the accident/claim." (ECF No. 26, p. 1.) The payment history for costs arising out of the accident may encompass more costs than for the two lawsuits.

- 22 -

future wage loss/lost earning capacity in the amount of $300,000 to $400,000; viable claims for permanent injury; and a conceded exacerbation of pre-existing condition.

Liberty was unaware of any opportunity for Ryder/Old Republic to resolve the Martinez lawsuit within the remaining limits of the Old Republic policy. According to Greeley, he did not know if there was such an opportunity because he was not involved in the case prior to receiving notice of it and because he never saw the claims file. (ECF No. 67-1, pp. 25-26.) Greeley testified that he lacked all the information necessary to make an intelligent determination regarding opportunities to settle the Martinez action because he "didn't have copies of everything." (*Id*. at 19.) Liberty concluded that liability was 100% adverse to its insureds in the Johnson and Martinez lawsuits. Greeley, Liberty's claims adjuster, was never told by anyone at Ryder that the Old Republic policy provided "sole" primary coverage for the claims/lawsuits. (*Id*. at 7-8.) Greeley understood that when Ryder was looking for excess coverage it was conceding that Old Republic's coverage was primary and that Liberty's policy was excess to that coverage. (ECF No. 57-3, p. 10.) Ryder's claim notes state that the Liberty policy provided excess coverage. (ECF No. 57-1, p. 40)

- 23 -

Analysis

The parties are in apparent agreement that substantive Wisconsin law applies to the insurance issues presented. In applying Wisconsin law, the Court generally applies the law of the Wisconsin Supreme Court. *Home Valu, Inc. v. Pep Boys,* 213 F.3d 960, 963 (7th Cir. 2000). If, however, "the Wisconsin Supreme Court has not spoken on the issue," the Court must "treat decisions by the state's intermediate appellate courts as authoritative 'unless there is a compelling reason to doubt that [those] courts have got the law right.'" *Id.* (citations omitted). Moreover, if the Court is "faced with two opposing and equally plausible interpretations of state law, '[it should] generally choose the narrower interpretation which restricts liability, rather than the more expansive interpretation which creates substantially more liability.'" *Id.*

The Plaintiffs seek summary judgment declaring that Liberty was a "co-primary" insurer with Old Republic for the vehicles involved in the accident and is responsible for paying half of the settlement and defense costs of the two lawsuits arising out of that accident—$410,557.76, plus costs. By its cross-motion, Liberty seeks declaratory judgment that it is not liable for any costs and expenses and dismissal of the action, asserting that the Plaintiffs' failure to provide it with timely notice of the two lawsuits

- 24 -

prejudiced its ability to investigate, evaluate, and defend them, including missing settlement opportunities, and to determine coverage under its policies. Liberty also maintains that in any event it is not liable for the defense costs incurred in the Martinez or Johnson actions because the defense of those actions was not tendered until November 15, 2013.

The interpretation of an insurance policy contract is a question of law for the Court. *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.,* 268 Wis. 2d 16, 673 N.W.2d 65, 73 (Wis. 2004). Here, Liberty agrees that if it had been given proper notice of the lawsuit, its policy would have provided co-primary coverage for the property damage and the Johnson and Martinez lawsuits.

### Defense Costs

In opposing the Plaintiffs' attempt to recover defense costs, including attorney fees paid to defense counsel, incurred in the defense of the Johnson and Martinez lawsuits, Liberty relies on *Towne Realty, Inc. v. Zurich Ins. Co.,* 201 Wis. 2d 260, 548 N.W.2d 64, 68 (Wis. 1996), which addressed whether the insurer was liable for defense costs after receiving an ambiguous communication from its insured about a lawsuit and whether the insured wanted the carrier to assume the defense. *Id.* at 66. The Wisconsin Supreme Court stated that if the insured is unclear or

- 25 -

ambiguous about whether it "wishes the insurer to defend the suit," it is the "responsibility of the insurer to communicate with the insured" on that issue to clear up any ambiguity. *Id.* at 67. But an insurer has no obligation to pay defense costs prior to tender. *Id.* at 68.

With respect to the Johnson lawsuit, the undisputed facts establish that it was not tendered to Liberty until after the matter was settled and all defense costs had been incurred. That case was filed in August of 2010 and was settled after mediation in September 2011. However, Liberty did not learn of the lawsuit until seven months later, in April 2012. By that time the case had already proceeded through discovery and to settlement without any notice to, or involvement from, Liberty. Consequently, as a matter of law, Liberty is not liable for any defense costs incurred in that action. *See id.* Therefore, summary judgment on the issue of defense costs in the Johnson lawsuit is denied with respect to the Plaintiffs and granted with respect to Liberty.

For the Martinez lawsuit, the undisputed facts show that there was no ambiguity regarding whether Expedited expected Liberty to assume the defense of that suit—it did not. On April 4, 2012, the day Expedited reported the Martinez lawsuit, Duffy informed Liberty that the lawsuit was already being defended by another insurance company. The next day,

- 26 -

Duffy made clear that Ryder had been defending the Martinez lawsuit, that he just wanted Liberty to know about the lawsuit, and that he would have his attorneys contact Liberty if there was any exposure to its policy.

There is a factual dispute regarding whether or not McDermott informed Greeley that Ryder was providing primary coverage for the Martinez lawsuit and that the Liberty coverage was excess to Ryder's coverage. Liberty relies on the fact that McDermott did not demand that it assume defense of the Martinez lawsuit, nor did she indicate that it should begin paying 50% of defense costs incurred. Liberty contends that counsel for Ryder/Old Republic first presented Liberty with the position that the two policies were co-primary on November 15, 2013, and that it does not have any liability for defense costs incurred prior to that date.

However, *Towne Realty* holds that tender occurs on the date the insurer received notice of the lawsuit against the insured. *Id.* at 67. In so holding, the court noted that this approach discourages the insurer from defaulting in the performance of its duty to defend. *Id*. It also noted that "placing the duty upon the insurer is not as onerous as placing it on the insured: insurers are usually more sophisticated and knowledgeable than insureds regarding the insurer's duty to defend and insurers are in a better position than insureds to facilitate clear communication between the

- 27 -

parties." *Id.*

The Martinez lawsuit was tendered to Liberty on April 4, 2012, the date Liberty learned of it. Under the undisputed facts, as a matter of law, Liberty's liability for defense costs began on that date. *See id* at 68. Therefore, summary judgment is granted for Plaintiffs on the issue of Liberty's liability for the costs of defense of the Martinez lawsuit as of April 4, 2012, and is denied with respect to Liberty. The dollar amount of those costs cannot be resolved on summary judgment because the claimed costs are disputed. Moreover, even if not disputed, the Plaintiffs have not established the costs attributable to the defense of the Martinez action.

## Notice

Liberty also contends that it is not liable for 50% of the settlement amounts paid to resolve either lawsuit because it received untimely notice of them, which prejudiced it. Wisconsin law recognizes that insurers have the right to timely notice of claims filed against their insureds, and this notice is "a condition precedent to the insurer's contractual duties to both defend and indemnify." *West Bend Co. v. Chiaphua Indust., Inc*., 112 F. Supp. 2d 816, 822 (E.D. Wis. 2000) (quoting *U.S. Fire Ins. Co. v. Green Bay Packaging, Inc.,* 66 F. Supp. 2d 987, 1000 (E.D. Wis. 1999)). The insurer has the burden to show that notice was not timely. *Neff v. Pierzina*, 245

Wis. 2d 285, 629 N.W.2d 177, 184 (Wis. 2001). To make its case, the insurer must come forward with evidence that the insured has not complied with the notice requirements of the policy. *Id.*

The requirement that an insurer receive timely notice "is to afford the liability carrier an opportunity to investigate possible claims against the policy or its insured while the witnesses are available and their memories are fresh." *Gerrard Realty Corp. v. Am. States Ins. Co.,* 89 Wis. 2d 130, 277 N.W.2d 863, 869 (Wis. 1979). The Wisconsin Supreme Court observed that an insurer cannot make a reasoned judgment regarding its defense or coverage obligations until it has "had the opportunity to examine and review the factual situation and the pleadings as they relate to the terms of [its] policy of insurance." *Id.*

The duty to notify a liability carrier of a suit is triggered by service of a summons and complaint. *Id.* at 869-70. *Gerrard* also holds that provisions in an insurance policy requiring "immediate" notice of a claim or lawsuit require that the insurer be given notice within "a reasonable time." *Id.* at 870. Whether notice was afforded in a reasonable amount of time is often a question of fact; however, in *Gerrard* the court held that a 22-month delay was unreasonable as a matter of law. *Id.* at 870-71 (collecting cases including *Sanderfoot v. Sherry Motors, Inc.,* 33 Wis. 2d 301, 147 N.W.2d

- 29 -

255 (Wis. 1967) (7½-month delay unreasonable as a matter of law); *Britz v. Am. Ins. Co.*, 2 Wis. 2d 192, 86 N.W.2d 18 (Wis. 1957) (three-month delay unreasonable as a matter of law)).  *See also, Phoenix Contractors, Inc. v. Affiliated Capital Corp.,* 273 Wis. 2d 736, 681 N.W.2d 310, 313 (Wis. Ct. App. 2004) (insured admitted 14-month delay was untimely); *Neff*, 629 N.W.2d at 186-87 (23-month delay unreasonable and untimely); *Fireman's Fund Ins. Co. of Wis. v. Bradley Corp.*, 261 Wis. 2d 4, 660 N.W.2d 666, 682 (Wis. 2003) (15-month delay admitted untimely); *Chiaphua*, 112 F. Supp. 2d at 823 (five-year delay untimely).

There is a factual dispute regarding when Liberty received notice of the property damage claims.  That dispute cannot be resolved on summary judgment and therefore will not be addressed at this time.

However, the undisputed facts establish that Liberty did not receive notice of the Johnson and Martinez actions until 20 months after they were filed.  By that time, discovery had been conducted in the Johnson action and it settled at mediation with Ryder defending and agreeing to pay $290,000.  The late notice of the Johnson claim deprived Liberty of the opportunity to investigate its coverage and have a role in the defense of the lawsuit.

With regard to the Martinez lawsuit, that action proceeded for 17

- 30 -

months, through discovery and motion practice, and was headed to trial in March of 2012 when Ryder agreed to vacate all deadlines, settlement conference date, and the trial date. This 20-month delay had a significant effect on the lawsuit and the eventual amount paid to settle the case. Liberty was prejudiced by its exclusion from the case.

Liberty also maintains that it did not receive timely notice of the Johnson or Martinez lawsuits, pointing out that the liability policy it issued to Expedited expressly required that those seeking coverage provide immediate notice of claims or lawsuits to Liberty by immediately sending it copies of any request, demand, order, notice, summons or legal paper received concerning the claim or "suit." The failure to notify Liberty of the underlying lawsuits for over 20 months was unreasonable as a matter of law, and constitutes a breach of the policy. *See Gerrard Realty,* 277 N.W. 2d at 871.

## Prejudice

Wisconsin law follows a "notice-prejudice" rule whereby late notice of a claim will not relieve an insurer of its duties under its policy unless the insurer has been prejudiced by the delay. *See* Wis. Stats. §§ 631.81(1), 632.26(2). Prejudice to the insurer is a serious impairment of the insurer's ability to investigate, evaluate, or settle a claim, determine coverage, or

- 31 -

present an effective defense resulting from the unexcused failure of the insured to provide timely notice. *See Neff,* 629 N.W.2d at 185. Prejudice can arise when untimely notice prevents an insurer from investigating coverage under its policy and efficiently resolving the case. *See id* at 187-88. Whether an insurer has been prejudiced by late notice is ordinarily a question of fact, but a court may resolve that issue as a matter of law when the facts are not in dispute. *Id.* at 186.

When discussing the timely notice requirement, the Wisconsin Supreme Court noted that "[a]n insurer has the right to limit its liability by the terms of its contract." *Id.* at 187. An insurer that does not receive timely notice of claims is prejudiced because it may not be able to determine its coverage responsibilities promptly and may not be able to resolve the matter efficiently. *Id.; see also Chiaphua Indus.,* 112 F. Supp. 2d at 827 (prompt notice allows insurer to protect its own interests). Prejudice is also established when an insurer has been denied the opportunity to have input into the manner in which the underlying claim is being defended. *Fireman's Fund Ins. Co.*, 660 N.W.2d at 683.

Under Wisconsin law, when notice is received more than one year after the time required by the policy, there is a rebuttable presumption of prejudice and the burden of proof shifts to the claimant to prove that the

- 32 -

insurer was not prejudiced by the untimely notice. *Gerrard Realty,* 277 N.W.2d at 872 (discussing interplay of Wisconsin's statutory scheme). An insured seeking to rebut this presumption of prejudice cannot merely rely on evidence that it defended the lawsuit well enough on its own. *Int'l Flavors & Fragrances, Inc. v. Valley Forge Ins. Co.,* 304 Wis. 2d 732, 738 N.W.2d 159, 165 (Wis. Ct. App. 2007) Rather, proof of the lack of prejudice to the insurer must be by "direct and conclusive evidence." *Gerrard Realty,* 277 N.W.2d at 872.

The undisputed facts establish that Liberty was, in fact, substantially prejudiced by the late notice of the Johnson and Martinez lawsuits, and that prejudice was compounded by the positions of Expedited and Ryder that Liberty's coverage was excess, applying only above Ryder's primary limits.

The Johnson and Martinez actions were filed in Indiana and Illinois state courts, respectively, in August of 2010. Liberty was not notified of the lawsuits when they were filed, nor was it notified when the cases were removed and transferred to the federal court in Indiana. It was not until over 20 months later that Expedited called Liberty and informed it of the Martinez lawsuit. By that time, the Johnson lawsuit had been settled and the property damage claims paid. Although there is a dispute regarding

- 33 -

whether Liberty was initially told that it was excess to the primary coverage provided by Ryder, it was not for another 19 months that Liberty was informed of Ryder's new explicit position that Liberty's coverage was co-primary. Expedited and Ryder were obviously aware of the lawsuits when they were filed, and Expedited was aware that Liberty had issued commercial auto coverage to it.

The Johnson lawsuit was filed in state court and removed to federal court, eventually ending up in the Northern District of Indiana; it proceeded through discovery to mediation and ultimately settlement without any participation from Liberty. Liberty was denied the opportunity to select defense counsel and have input regarding litigation strategy. It had no chance to review Johnson's medical records, no ability to value Johnson's claims in advance of mediation, and no chance to help select a mediator or make decisions about settlement strategy. Wisconsin courts have found prejudice as a matter of law when a carrier is not provided notice of a lawsuit until after the matter has been settled or resolved by trial. *See Gerrard Realty,* 277 N.W.2d at 871 (holding that insured failed to overcome presumption of prejudice created by giving notice to carrier 22 months after lawsuit had been filed). *See also, Chiaphua Indus.,* 112 F. Supp. 2d at 823-24 (holding that the "only

- 34 -

reasonable conclusion a jury could reach was that [Royal Insurance of America ("Royal")] was prejudiced" by late notice. "By the time the [lawsuit] came to the attention of [Royal], . . . the case 'was settled, done deal, check was being issued'").

In *Chiaphua Indus.,* the plaintiff attempted to rebut the presumption of prejudice by establishing that its defense and settlement of the underlying suit was reasonable and by emphasizing Royal's inability to prove that it could have settled the lawsuit for less. *Id.* at 823-24. In the court's eyes, however, this made no difference:

> There is no way of knowing, for sure, whether these activities would have served to reduce the settlement value of the case. In other words, Royal cannot prove that the case would have settled for less than $120,000 had it been involved from an early stage. On the other hand, it is not Royal's burden to prove that it was prejudiced by late notice. *Rather, because of the considerable delay in notifying Royal, it is [the plaintiff's] burden to prove by 'direct and conclusive' evidence that Royal was not prejudiced.*

*Id.* at 824. The insured failed to do so, and the court held that the insurer had been prejudiced as a matter of law. *Id.*

As in *Chiaphua Indus.,* here it is the Plaintiffs' obligation to prove by direct and conclusive evidence that Liberty was not prejudiced by the late notice of the Johnson lawsuit. Yet the undisputed facts show that Liberty was prejudiced. For these reasons, this Court grants summary

judgment in favor of Liberty, declaring that it has no obligation to reimburse the Plaintiffs for any defense costs or settlement funds related to the Johnson lawsuit; and denies summary judgment to the Plaintiffs on the issue.

The undisputed facts also establish that Liberty was prejudiced by the late notice of the Martinez lawsuit. The inability to have input into the Johnson lawsuit and property damage claims, and how they were resolved, directly affects the amount that the Plaintiffs are trying to recover from Liberty for settlement of the Martinez lawsuit. The $290,000 settlement payment for the Johnson action and the $81,792.26 payment for the property damage claims reduced Ryder's available limits to $628,207.74. Thus, the prejudicial exclusion of Liberty from the Johnson lawsuit did not just affect that action; it reduced the money available from Ryder to resolve the Martinez action, and increased the amount the Plaintiffs want to recover from Liberty in this action.

Liberty was further prejudiced by the delayed notice because it was deprived of an opportunity to provide input into the Martinez defense. The Martinez action proceeded for over 20 months before Liberty was aware it existed. During that time, the parties proceeded through discovery, filed and resolved several motions to compel, arranged for expert testimony,

- 36 -

agreed to a stipulation conceding liability, and scheduled settlement conferences. Liberty was deprived of any opportunity to participate in these important defense decisions.

The substantial delay caused Liberty to miss valuable settlement opportunities. Prejudice can be established when an insurer's absence from the defense prevents it from pursing settlement opportunities. *Neff,* 629 N.W.2d at 188. The Martinez court set a settlement conference for February 2, 2012 and a jury trial for March 5, 2012, which afforded Ryder 17 months to gather medical records, estimate the settlement value of the case, and prepare for the settlement conference and trial. By that time, Martinez had undergone certain medical procedures related to his knee.

However, the trial did not proceed as scheduled and the scope of potential damages in the Martinez lawsuit became worse for the insurers as time progressed. As the first settlement conference and trial approached, new medical conditions were discovered and new surgeries scheduled. Rather than limiting damages and trying the case as originally scheduled, Ryder moved to vacate the settlement conference and trial dates and agreed to an extension sought by Martinez. This extension doubled the ultimate settlement value of the claim. All of this occurred before Liberty was notified of the existence of the lawsuit. These undisputed facts

- 37 -

show that Liberty was prejudiced by Ryder's delay. Liberty had no opportunity to contribute to the action's defense, to timely seek complete medical records, to prepare for the settlement conference and trial, and to obtain expert and other testimony to put the defense in the proper position to settle the case at the February 2012 settlement conference. Liberty also had no opportunity to oppose Martinez's request for extensions of time. If Liberty had been afforded such opportunities, it would have proactively handled the defense of the matter by contacting Martinez's counsel early in the case and attempting to settle the case prior to the additional surgery and for less money.

Ryder/Old Republic's request for, and agreement to, continuation of the February 2012 settlement conference and the March 2012 trial increased the scope of potential damages and, ultimately, the settlement value of the Martinez lawsuit. Prior to its decision to seek a continuance, Ryder estimated that the value of Martinez's claim was between $325,000 and $450,000. After the continuation, and as a result of the new treatment, Martinez sent a new demand letter seeking $3.5 million.

In the fall of 2012, Ehrhardt estimated that the value of the lawsuit without consideration of the neck and cervical issues was between $100,000 and $185,000. Britton generally agreed with this valuation,

- 38 -

stating that without consideration of the new issues related to the neck surgeries, the settlement value of the case was between $200,000 and $250,000. Britton was also of the opinion that if the jury believed Martinez's neck and back claims were attributable to the accident, the potential damages could exceed $1.5 million. After the failed November 2013 mediation, Martinez threatened to pursue a claim for bad faith against Liberty, creating additional pressure for Liberty to settle. Ultimately, the claim settled for $1,050,000, an amount approaching Britton's $1.5 million estimate and far in excess of the earlier pre-cervical spinal surgery settlement estimates.

The late notice of the Martinez lawsuit, coupled with Ryder's eleventh-hour co-primary concept, caused additional prejudice to Liberty's ability to investigate its coverage and effectively settle the Martinez lawsuit. Liberty learned of Ryder's co-primary position one day before mediation. Until then all parties had proceeded with the understanding that Ryder's coverage was primary and Liberty's coverage was excess. This prejudice was exacerbated when Martinez's counsel alleged bad faith during subsequent settlement negotiations. Subject to mounting pressure from both sides and its duty to protect its insured, Liberty had few options other than to accept Ryder's proposal to reserve rights on the coverage

- 39 -

issue and settle the case.

The Plaintiffs suggest that they provided a full and capable defense in both the Johnson and Martinez lawsuits and Liberty should not complain. However, it is Ryder, not Liberty, which has the burden of proving by clear, direct, and conclusive evidence that Liberty was not prejudiced by late notice of the lawsuits.

More importantly, Wisconsin law generally rejects this strategy to establish that an insurer was not prejudiced by late notice. In *Phoenix Contractors*, an insurer did not receive notice of a claim against its insured for 14 months. During that time, the insured (Phoenix) undertook the defense of that claim on its own, tendering it to its carrier (Rural Mutual) just a few weeks before trial. 681 N.W.2d at 311-12. Phoenix conceded that the tender was untimely, and the court found that Rural Mutual suffered prejudiced because it "had been deprived of the opportunity to conduct depositions, serve interrogatories, independently investigate [the claimant's] claims and participate in arbitration." *Id.* at 315. Phoenix countered by pointing "to its own investigation, the reports of its experts, [the claimant's] answers to its interrogatories, and the arbitration proceeding," arguing, in essence, that it had adequately defended the lawsuit and that Rural Mutual actually benefitted from its conduct. *Id.* In

- 40 -

rejecting the argument, the court noted that the argument made a number of unwarranted assumptions:

> First, Phoenix assumes that if Rural Mutual had been given the opportunity to make a timely investigation, it would have produced the same result as that produced by Phoenix's investigation. Second, Phoenix assumes that any discovery that Rural Mutual would have conducted would parallel that already conducted by Phoenix. From this, Phoenix further assumes that any defenses asserted by Rural Mutual would be the same as those currently asserted by Phoenix.

*Id.* The court ultimately held that, as a matter of law, this type of evidence "does not counter the presumption that Rural Mutual's ability to make these judgment and to take these actions has been seriously impaired." *Id.* at 316. It is the same in this case.

Moreover, Wisconsin cases have found prejudice (even when the case is being defended by another insurer or party) when, had it received notice of the lawsuit, the insurer would have stepped in, investigated the claim, and attempted to avoid litigation costs by negotiating with the underlying plaintiff. *Ansul, Inc. v. Employers Ins. Co. of Wausau,* 345 Wis. 2d 373, 826 N.W.2d 110, 119 (Wis. Ct. App. 2012); *Neff*, 629 N.W.2d at 188. That is precisely what Liberty asserts it would have done in the Martinez case if it had received timely notice. The undisputed facts establish that Liberty was prejudiced by its late notice of the Martinez lawsuit. Not only did the

- 41 -

prejudice of its exclusion from the Johnson lawsuit carry over to the Martinez lawsuit, the undue delay in notifying Liberty of that suit prevented it from having important input into the defense of that matter and from getting involved to pursue settlement opportunities. Finally, Liberty suffered additional prejudice by Ryder's eleventh-hour co-primary position, advanced one day before the November 2013 mediation. Based on the foregoing the Court concludes that Liberty is not liable for the amounts paid to settle the Johnson and Martinez actions.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

The Plaintiffs' motion for summary judgment (ECF No. 23) is **GRANTED** to the extent that Liberty is liable for the defense costs of the Martinez lawsuit as of April 4, 2012, and is **DENIED** with respect to Liberty's liability for the defense of the Johnson lawsuit and the property damage claim, as well as for the settlement of the Johnson and Martinez lawsuits. The dollar amount of the defense costs for the Martinez lawsuit beginning on April 4, 2012 is to be determined.

Liberty's motion for summary judgment (ECF No. 50) is **GRANTED** to the extent that it is not liable for the defense costs of the Johnson lawsuit and is not liable for the settlement of the Johnson and Martinez

- 42 -

actions, and **DENIED** as to its liability for defense costs of the Martinez lawsuit and liability for the property damage claim.

Dated at Milwaukee, Wisconsin, this 30th day of September, 2015.

BY THE COURT:

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**

- 43 -